**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TERRI LYNN PRYBOROWSKI,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **2:13-cv-1038-TFM** |
| v. | ) |
| | ) |
| **CAROLYN W. COLVIN**, | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**MEMORANDUM OPINION AND ORDER OF COURT**

July 14, 2014

**I.      Introduction**

Terri Lynn Pryborowski ("Plaintiff"), brought this action pursuant to 42 U.S.C. § 405(g),
for judicial review of the final determination of the Commissioner of Social Security
("Commissioner"), which denied her applications for disability insurance benefits ("DIB") and
supplemental security income ("SSI") under Subchapter II, 42 U.S.C. §§ 401, *et seq*., and
Subchapter XVI, 42 U.S.C. § 1381, *et seq*., of the Social Security Act ("Act").[1]  This case is
before the Court on the parties' cross-motions for summary judgment.  The record was
thoroughly developed at the administrative level of the proceeding.  Each side filed a brief in
support of its motion (ECF Nos. 9 and 12), and the Commissioner also filed a reply brief in
response to the Plaintiff's motion (ECF No. 15).  Accordingly, the matter is ripe for disposition.
For the reasons that follow, the Commissioner's motion will be **GRANTED**, and Plaintiff's
motion will be **DENIED**.

---

1.  Plaintiff protectively filed her DIB and SSI applications on September 23, 2010.  (R. 205).  The applications for
DIB and SSI are dated October 1, 2010 and October 13, 2010, respectively.  (R. 153-160).

## II.    Background

### A.    Factual Background

Plaintiff was born on August 27, 1971 and was thirty-eight-years-old as of her alleged onset date.  (R. 34).  Under the Regulations, she is considered a "younger person."  20 C.F.R. §§ 404.1563(c), 416.963(c).  Plaintiff earned a high school equivalency diploma through a General Education Development ("GED") program and has past relevant work experience as a potato farm laborer, dishwasher, forklift operator, cleaner, cook, school bus driver, and delivery person for, Comtran, FedEx, and a pizza shop.  (R. 35-37).  Plaintiff has a twelve-year-old daughter for whom she is the primary caregiver.[2]  (R. 34).  As needed, Plaintiff does laundry, cleans, shops, and drives a car.  (R. 34, 209-13).

Plaintiff alleges disability as of August 7, 2010 due to a cerebral vascular accident (*i.e.*, a stroke), and related symptoms such as numbness in her right arm through her hand and fingers, as well as dizzy spells, an inability to sit for long periods of time, and headaches.  (R. 35, 37-39, 43, 50).[3]  The record reflects that Plaintiff has not engaged in substantial gainful activity since her alleged disability onset date.

### 1.    History of Medical Treatment

In August 2010, Plaintiff presented to UPMC Mercy Hospital with right-sided numbness and underwent diagnostic testing.  (R. 267).  A CT scan revealed an old lacunar infarct cerebellum, but no acute urticarial infarct or hemorrhage.  (R. 268).  A MRI showed multiple new embolic strokes.  (R. 268).  Plaintiff's medical records reflect that she was diagnosed with a

---

2.  Plaintiff also has a twenty-one year old son who lives with his grandfather.  (R. 1157).

3.  The record reflects that this event may have been two "mini-strokes."  *Compare* R. 1024 ("This patient is a 40-year-old-woman who reports previous 2 'mini-strokes in 08/2010 for which she was transferred and treated at Mercy Hospital in Pittsburgh.") *with* R. 419 ("[S]he had been hospitalized with a small stroke on the basis of a clot that formed on a plaque in her carotid artery").

left temporal-parietal stroke with residual right hand numbness. (R. 265). Less than a week later, Plaintiff reported that she had no residual symptoms from her stroke. (R. 423).

Later that month, Plaintiff went to the emergency room at UPMC Mercy with complaints of chest pain. (R. 400). She was admitted for testing, and an electrocardiogram (ECG) showed normal sinus rhythm and no abnormalities. (R. 399, 402). Plaintiff refused any further diagnostic testing and became "belligerent" when the emergency department staff attempted to convince her to stay for additional evaluation. (R. 402-03). Moreover, Plaintiff repeatedly demanded discharge and refused to discuss diagnostic and therapeutic measures for coronary artery disease with emergency department staff. (R. 403). Plaintiff was ultimately discharged against medical advice. (R. 403). The attending physician later documented that the etiology of Plaintiff's chest pain was unclear, but that he doubted aortic dissection based on Plaintiff's normal appearance, normal vital signs, her nonfocal neurovascular examination in all four extremities, and the time course that had elapsed since symptom onset. (R. 403). He also doubted pulmonary embolus. (R. 403).

Plaintiff followed up with her primary care physician, Dr. Richard Egan, the next day at which she reported slight clumsiness and a "pins and needles" sensation in her right hand as the only residual side effects of her stroke. (R. 419, 311). Dr. Egan found that Plaintiff had intact sensation, intact motor function, normal station and gait, normal finger to nose test, negative Romberg's test, full orientation, appropriate mood and affect, normal interaction, and good eye contact. (R. 421). Dr. Egan also adjusted Plaintiff's medication at this time. (R. 419-21).

In September 2010, Plaintiff presented herself to the emergency room at UPMC Mercy with acute abdominal pain, where she was diagnosed with acute cholecystitis (*i.e.*, gallbladder inflammation) with biliary obstruction with bile duct stone. (R. 348, 356). A laparoscopic

cholecystectomy was performed, and Plaintiff was discharged with a two-week heavy lifting restriction. (R. 349, 385-86). The medical records also note that her medications included Coumadin, Lisinopril, Atenolol, and Simvastatin and that she smoked a half-a-pack of cigarettes per day. (R. 348).

Later that month, Plaintiff visited Dr. Egan for a follow-up appointment regarding her gallbladder inflammation. (R. 415). The exam showed that she had intact sensation, intact motor function, normal station and gait, full orientation, appropriate mood and affect, normal interaction, and good eye contact. (R. 417).

In October 2010, Plaintiff returned to Dr. Egan with complaints of dizziness and balancing trouble. (R. 410). Dr. Egan noted that she had no new stroke symptoms, intact motor function, normal station and gait, a normal finger to nose test, full orientation, appropriate mood and affect, normal interaction, and good eye contact. (R. 410-12). Dr. Egan also added Meclizine to her medications. (R. 413).

In December 2010, Plaintiff met with Dr. Charles Diederich who performed a consultative examination. (R. 21 n.1, 452-455). The exam showed that while Plaintiff had loss of pinprick sensation on her right forearm, she maintained full strength in all muscle groups, full range of motion, negative straight leg raise tests, normal radial, ulnar, pretibial, and dorsalis pedis pulses, normal deep tendon reflexes, negative Romberg's test, and a normal gait. (R. 454, 458-61). Dr. Diederich did not restrict Plaintiff in lifting, carrying, standing and walking, sitting, pushing and pulling, postural activities, or environmental restrictions, but he did note her impairments with fingering and feeling. (R. 456-57). Dr. Diederich ultimately assessed that Plaintiff's stroke was still recent, that her sensory deficit in her right hand and forearm may improve, and that her strength was normal. (R. 455).

In January 2011, Plaintiff met Dr. Egan for a follow-up examination where she reported on-and-off left trapezious numbness as well as right hand numbness for the past month. (R. 653). Dr. Egan noted that he planned to stop prescribing Plaintiff Coumadin and to switch Plaintiff to an aspirin regimen. (R. 656). At this exam, Plaintiff had intact cranial nerves, intact sensation, intact motor function, normal station and gait, full orientation, appropriate mood and affect, normal interaction, and good eye contact. (R. 655).

In February 2011, Plaintiff returned to the emergency room at UPMC Mercy with complaints of vertigo spells. (R. 802-03). Plaintiff once again refused admission for further evaluation and testing. (R. 803). Plaintiff was discharged after the attending physician contacted Dr. Egan who agreed with the hospital's initial assessment that Plaintiff's symptoms did not represent a stroke. (R. 830, 803).

On March 14 2011, Plaintiff met with Dr. Egan for another follow-up visit at which she reported that her vertigo was going away and that she had no other neurological, cardiac, or respiratory symptoms. (R. 659). Dr. Egan noted that Plaintiff appeared depressed and tearful during the exam due to her boyfriend of four years walking out on her four months ago with no recent contact. (R. 659). The records further reflect that Plaintiff denied any suicidal ideation and that Dr. Egan prescribed her Bupropion. (R. 659, 662). Dr. Egan also found that Plaintiff had full orientation, good eye contact, normal interaction, intact cranial nerves, sensation, motor function, and normal station and gait. (R. 661).

Later that month, on March 18, 2011, Plaintiff presented herself to UPMC Mercy for what was diagnosed as a non-painful, easily reducible ventral hernia. (R. 813). Plaintiff was discharged home in good condition that day. (R. 813). Two days later, Plaintiff presented herself to UPMC for what was diagnosed as gastroenteritis. (R. 808). She was given a liter of

saline, 4 mg of Zofran, and 1 mg of Dilaudid, and underwent at CT scan and urinalysis. (R. 807-08). The CT scan was negative, and the urinalysis showed hematuria but no leukocyte esterase or nitrite. (R. 808). Afterward, Plaintiff did not require any further anti-nausea medication or pain medication. (R. 808).

On November 11, 2011, Plaintiff presented to Sharon Regional Health System with numbness of the body. (R. 1132-34). She underwent a CT scan of her head and a MRI of her brain. Neither revealed acute pathology. (R. 1157). Plaintiff also received a carotid ultrasound, which showed carotid artery stenosis. (R. 1163). An ECG revealed Plaintiff had a left ventricle diastolic relaxation abnormality. (R. 1167). Plaintiff's neurological examination, performed by Dr. K. Donald Stoudt and Dr. John Moore, showed that she had full orientation, intact cranial nerves, no sensory changes, no motor weakness, normal reflexes, coordination, and gait, intact cognitive function, and clear speech. (R. 1133-34). A consulting physician, Dr. Robert Salcedo, noted that Plaintiff had a possible transient ischemic attack or simply an anxiety attack because she thought that she was experiencing another stroke. (R. 1158). Dr. Salcedo recommended Plaintiff continue taking baby aspirin, attend physical and occupational therapy, and undergo a speech evaluation. (R. 1158).

The following day, Plaintiff followed-up with Dr. Scott Morgan at the Mercer Clinic. (R. 986). Dr. Morgan noted the lack of objective findings, observing that Plaintiff's minor numbness complaint did not match any neurological ailment. (R. 986). Dr. Morgan also recommended an increase in her aspirin dosage. (R. 986).

At the end of November 2011, Plaintiff attended physical and occupational therapy to treat intermittent bilateral extremity numbness and weakness. (R. 1247). Medical care providers

at the facility assessed that Plaintiff's memory was fair, that she was good at following directions, and that her rehabilitation would improve her neurological deficits. (R. 1247-48).

In early December 2011, Plaintiff went to Sharon Regional Health System where she reported mild cheek numbness, some numbness on her right side, and reduced grip strength. (R. 995-97). A neurological examination showed that Plaintiff had intact cranial nerves, intact cerebellar function, intact deep tendon reflexes, intact strength in lower extremities, full orientation, and normal recall. (1025, 1027). Plaintiff underwent an ECG and a CT scan, both of which were normal. (R. 998, 1024, 1027-28, 1033). A consulting physician diagnosed Plaintiff with having had a transient ischemic attack with vertigo and right-sided numbness. (R. 1025).

On January 25, 2012, Plaintiff visited Dr. Salcedo where she complained of headaches and dizziness since her stroke in August 2010. (R. 1258). Dr. Salcedo noted that Plaintiff had no residual neurological deficit and that her neurological exam was normal. (R. 1258). Additionally, Dr. Salcedo diagnosed Plaintiff with a chronic tension type headache, added medication, and advised her to quit smoking. (R. 1258-59).

On April 24, 2012, Dr. Morgan submitted a letter addressed "[t]o whom it may concern" in which he stated that "[Plaintiff] is currently disabled secondary to suffering a cerebrovascular accident. She suffers from balance problems, weakness, fatigue, vertigo and difficulty remembering." (R. 1262). This statement was sent to the Appeals Council "in regard to [Plaintiff's] disability claim." (R. 1260).

## 2. The Administrative Hearing & Record

An administrative hearing was held on December 15, 2011, before Administrative Law Judge James Pileggi (the "ALJ"). Plaintiff was represented by counsel and testified at the hearing. Dr. Fred A. Monaco, an impartial vocational expert, also testified at the hearing.

At the beginning of the hearing, counsel informed the ALJ that Plaintiff was scheduled for further neuropsychology testing on January 25, 2012. (R. 32). The ALJ expressed his desire for Plaintiff to move up her testing, but noted that he would leave the record open for thirty days and grant an extension if necessary.[4] (R. 32). The record was supplemented after the hearing and before the ALJ's opinion with Exhibits 13F, 14F, and 15F. (R. 16). Those exhibits are inpatient hospital records from Sharon Regional Medical Center and Mercer Family Medical Center from November and December 2011. After the ALJ issued his opinion on February 9, 2012, Plaintiff's counsel sent medical records from Dr. Salcedo dated January 25, 2012 (Exhibit 16F) to the Appeals Council on February 13, 2012 (R. 4, 5, 1254-59). Counsel also sent to the Appeals Council the April 2012 statement of Dr. Morgan regarding the disability claim (Exhibit 17F) on June 15, 2012. (R. 4, 5, 6, 1260-62).

Nevertheless, at the hearing, the ALJ first inquired into the frequency and severity of any residual effects of her stroke to determine disability. (R. 37-38). Plaintiff testified that she has numbness down her right arm, that she does not have feeling in her fingers, and that she occasionally drops items. (R. 38). Plaintiff further testified that she does not need assistance walking, but that she has dizzy spells at least once a month and limits herself to driving only when necessary. (R. 39-40).

The ALJ asked Plaintiff whether she has any mental or emotional problems for which she had to seek treatment from a mental health professional. (R. 41). Plaintiff responded that she did not. (R. 41).

---

4. Counsel for Plaintiff initially requested a postponement of the hearing until after the neurology appointment but indicated that he would proceed with the hearing as scheduled if the record would be left open until January 15, 2012. (R. 151). The ALJ denied the motion for postponement. After the hearing, counsel for Plaintiff requested that the record be left open until February 1, 2012. (R. 152). The ALJ approved this request. (ECF No. 6-1 at 2, 3) (R. 16, 152).

Further, Plaintiff testified that she helps her daughter with household chores on occasion, takes care of her personal needs, and grocery shops so long as she is accompanied. (R. 41-2). Plaintiff also indicated that she can lift with her right hand with some difficulty and expressed her inability to sit or stand longer than ten-fifteen minutes, although the ALJ noted that she had been sitting for twenty minutes at that point in her testimony. (R. 43-45). Aside from her right-sided numbness, limitations in lifting, and dizzy spells, Plaintiff indicated that she had no other residual symptoms. (R. 45).

After the ALJ concluded his initial questioning, counsel inquired into whether Plaintiff had any memory loss or cognitive changes from her stroke. (R. 45-46). Once Plaintiff responded in the affirmative, the ALJ interjected to ask Plaintiff if she had any cognitive testing of any kind with regard to her intelligence quotient ("IQ") or cognitive abilities. (R. 46). Plaintiff initially responded that she had not, but she later alleged that she expressed complaints about her memory and concentration to Dr. Morgan who apparently did not follow-up with her concerns. (R. 46-47). Plaintiff also noted that she experiences memory lapses and that her daughter helps her to recall information. (R. 47). The ALJ informed counsel that he could continue with questions as to Plaintiff's alleged memory loss, but advised as follows: "I think if we're going to, if we're going to pursue this line of questioning, that's fine but the results of those tests [*i.e.*, the neuropsychological testing scheduled for January 2012] are going to be dispositive of how I, how serious I consider those limitations." (R. 47). By all accounts, it appears that the records of that neuropsychological testing—the medical records from Dr. Salcedo dated January 25, 2012 (Exhibit 16F)—were never transmitted to the ALJ. (R. 4, 5, 1254-59).

Plaintiff also testified that she was being treated for depression by Dr. Morgan who continued her Wellbutrin prescription. (R. 48-49). Plaintiff indicated that she becomes anxious without the medication; however, she also stated that she still feels depressed because "they're not sure exactly what all is going on." (R. 50). Counsel then shifted his inquiry to Plaintiff's complaints of headaches. (R. 50). As Plaintiff described, her headaches entail brief bursts of shooting pain behind her left eye that affect her vision and occur on almost a daily basis. (R. 51). Plaintiff cited those symptoms as interfering with her ability to work. (R. 51-52). Further, Plaintiff noted that her speech has significantly slowed since her stroke. (R. 52).

Plaintiff also recounted her recent hospital trips at the hearing. (R. 52-54). The most recent visit occurred two weeks earlier due to an incident at the mall when the right side of her body became numb. (R. 52). According to Plaintiff, medical personnel suspected a very mild stroke, which would not appear on the scans. (R. 52-53).

Dr. Monaco, an impartial vocational expert, also testified at the hearing. Based on the hypothetical presented to him by the ALJ, Dr. Monaco opined that Plaintiff would be able to perform the requirements of representative occupations such as alarm monitor, credit checker, and hand packer. (R. 56-61). Dr. Monaco further opined that these representative occupations would still exist even if the RFC were modified to include an option to alternate between sitting and standing if necessary or a limitation requiring no exposure to hazards and dangerous machinery. (R. 56-61).

## B. Procedural History

On February 9, 2012, the ALJ rendered an unfavorable decision to Plaintiff in which he found that Plaintiff retained the ability to perform limited sedentary work existing in significant numbers in the national economy and, therefore, was not "disabled" within the meaning of the

Act.  The ALJ's decision became the final decision of the Commissioner on May 22, 2013, when the Appeals Council denied Plaintiff's request to review the decision of the ALJ.

On November 20, 2013, Plaintiff filed her Complaint in this Court seeking judicial review of the decision of the ALJ.  The parties have filed cross-motions for summary judgment. Plaintiff contends that the ALJ erred in not ordering a Psychological Consultative Examination, that the Mental Residual Capacity findings are not supported by medical evidence, and that the ALJ did not make sufficient credibility findings.  The Commissioner contends that the decision of the ALJ should be affirmed as it is supported by substantial evidence.  The Court agrees with the Commissioner, and therefore, will grant the motion for summary judgment filed by the Commissioner and deny the motion for summary judgment filed by Plaintiff.

## III.    Legal Analysis

### A.    Standard of Review

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g)/1383(c)(3).  If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court.  42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).  The United States Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971).  It consists of more than a scintilla of evidence, but less than a preponderance. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798 (3d Cir. 2010).

In situations in which a claimant files concurrent applications for SSI and DIB, courts have consistently addressed the issue of a claimant's disability in terms of meeting a single disability standard under the Act.  *See Burns v. Barnhart*, 312 F.3d 113, 119 n.1 (3d. Cir. 2002)

("This test [whether a person is disabled for purposes of qualifying for SSI] is the same as that for determining whether a person is disabled for purposes of receiving social security disability benefits [DIB]. *Compare* 20 C.F.R. § 416.920 *with* § 404.1520."); *Sullivan v. Zebley*, 493 U.S. 521, 525 n.3 (1990) (holding that regulations implementing the Title II [DBI] standard, and those implementing the Title XVI [SSI] standard are the same in all relevant aspects.); *Morales v. Apfel*, 225 F.3d 310, 315-16 (3d. Cir. 2000) (stating that a claimant's burden of proving disability is the same for both DIB and SSI).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920 (1995). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (internal citation omitted); 42 U.S.C. § 423 (d)(1) (1982). This may be done in two ways: (1) by introducing medical evidence that the claimant is disabled per se because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1, *see Heckler v. Campbell*, 461 U.S. 458 (1983); *Newell*, 347 F.3d at 545-46; *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004); or,

(2) in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Newell*, 347 F.3d at 545-46; *Jones*, 364 F.3d at 503. Once it is shown that a claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Rutherford*, 399 F.3d at 551; *Newell*, 347 F.3d at 546; *Jones*, 364 F.3d at 503; *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002).

Where a claimant has multiple impairments which may not individually reach the level of severity necessary to qualify any one impairment for Listed Impairment status, the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 502 (3d Cir. 2009); 42 U.S.C. § 423(d)(2)(C) ("in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity").

In this case, the ALJ determined that Plaintiff was not disabled within the meaning of the Act at the fifth step of the sequential evaluation process. In making this determination, the ALJ concluded that that Plaintiff has the residual functioning capacity to perform sedentary work, limited to simple, routine, and repetitive tasks with no more than occasional gripping, grasping,

and handling with right hand, as well as prohibited from climbing, crawling, kneeling, and balancing on heights.

## B. Discussion

As set forth in the Act and applicable case law, this Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Med. Cntr. v. Heckler*, 806 F.2d 1185, 1190 (3rd Cir. 1986), *cert. denied.*, 482 U.S. 905 (1987). The Court must review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).

Plaintiff raises three issues in her motion for summary judgment: (1) that the ALJ should have ordered a neurological consultative examination based on the mental impairments alleged by Plaintiff; (2) that the ALJ's Mental Residual Capacity findings were not supported by medical evidence; and (3) that the ALJ did not make sufficient credibility findings. The Court will address these issues seriatim.

1. *Whether the ALJ failed to develop the record when he did not order a Psychological Consultative Examination to assess the severity of Plaintiff's claims.*

Plaintiff first argues that the ALJ failed to adequately develop the record because he did not order a psychological consultative examination to evaluate her depression, memory problems, and cognitive defects.[5] Further, Plaintiff contends that there is no record evidence as to the severity her cognitive limitations. This Court cannot agree.

---

5. Plaintiff seems to suggest that a consultative examination was necessary given the absence of any records from the January 25, 2012 neuropsychological exam, which the ALJ noted would be dispositive of the issue. As Plaintiff states: "[f]or reasons that are not revealed in the record, no neuropsychological examination was ever submitted into the record after the hearing." Pl.'s Br. at 3, ECF No. 12. Plaintiff is mistaken. As the Court previously discussed, the ALJ left the record open for thirty days and allowed an extension for Plaintiff to transmit any such relevant records. Plaintiff failed to do so. Rather, Plaintiff submitted the medical records dated January 25, 2012 received from Dr. Salcedo to the Appeals Council four days after the ALJ rendered an unfavorable decision. (R. 4, 5, 1254).

The ALJ has "a duty to develop the record when there is a suggestion of mental impairment by inquiring into the present status of the impairment and its possible effects on the claimant's ability to work." *Plummer v. Apfel*, 186 F.3d 422, 434 (3d Cir. 1999). Moreover, the ALJ may discharge this duty "by remanding the case for further development, by seeking medical assistance, or perhaps by soliciting testimony directly from the claimant." *Id.* The applicable regulations also allow an ALJ to seek the opinions of a medical expert; however, a decision regarding whether to order a consultative examination rests in the sound discretion of the ALJ. *See Hockensmith v. Astrue*, 906 F. Supp. 2d 319, 332 (D. Del. 2012) (citing 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)(iii)); *see also Cartagena v. Comm'r of Soc. Sec.*, 2:10-CV-05712-WJM, 2012 WL 1161554, at *2 (D.N.J. Apr. 9, 2012) (noting that the ALJ has a heighted duty to develop the record when a claimant appears unrepresented).

But "the ALJ's duty to develop the record does not require a consultative examination unless the claimant establishes that such an examination is necessary to enable the ALJ to make the disability decision." *Thompson v. Halter*, 45 F. App'x. 146, 149 (3d Cir. 2002) (citing 20 C.F.R. §§ 404.1517, 416.917; *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1997)). "Other circumstances necessitating a consultative examination include situations where a claimant's medical records do not contain needed additional evidence, or when the ALJ needs to resolve a conflict, inconsistency or ambiguity in the record." *Basil v. Colvin*, CIV.A. 12-315E, 2014 WL 896629, at *2 (W.D. Pa. Mar. 6, 2014) (citing 20 C.F .R. §§ 404.1519(a), 416.919(a)).

Although the ALJ has a duty to develop the record, the burden ultimately rests with the plaintiff to present evidence of his or her disability. 42 U.S.C. § 423(d)(5)(A). *See, e.g., Jones v. Comm'r of Soc. Sec.*, CIV.A. 10-06083, 2012 WL 1339443, at *9 (D.N.J. Apr. 17, 2012) ("The

---

Plaintiff does not, however, contend that those medical records would warrant remand. *See generally Matthews v. Apfel*, 239 F.3d 589 (3d Cir. 2001). The Court notes that those records reflect that Plaintiff denied depression, anxiety, memory loss, or suicidal ideation. (R. 1257).

Plaintiff did not meet her burden to show that her depression was severe or significantly interfered with her work, and cannot now argue that the ALJ should have *sua sponte* demanded further evidence on this point."); *Florence v. Astrue*, 0CIV.A. 06-4571, 2008 WL 564871, at *7 (E.D. Pa. Feb. 29, 2008) (citing *Podeworny v. Harris,* 745 F.2d 210, 217 (3d Cir. 1984)); *see also* 20 C.F.R. §§ 404.1740(b)(1), 416.1540(b)(1). A claimant seeking an award of benefits must present evidence demonstrating his or her inability to perform work-related tasks. *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5 (1987) (explaining that the claimant "is in a better position to provide information about his [or her] own medical condition"). When the claimant's inability to engage in a certain work-related activity has not been established, the Commissioner may assume that the claimant is able to engage in that activity without seeking confirmation from a medical expert. *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 362 (3d Cir. 2011) (remarking that an administrative law judge may assess a claimant's residual functional capacity without requesting "outside medical expert review of each fact incorporated into the decision").

Here, the record was adequately developed to enable the ALJ to make the disability decision. At the hearing, Plaintiff denied having any mental or emotional problems for which she had to seek treatment over the last eighteen months and later recounted that she was experiencing memory loss and depression. Although the record reflects that Plaintiff has discussed or complained of depression with her treatment providers, she never reported any symptoms of depression to her physicians between September 2008 and January 2011. The record also reflects that no treating physician has found that she suffers memory loss as a side effect of her stroke. It was not until early-2011 that Plaintiff reported to Dr. Egan that she felt depressed and that her long-term boyfriend had abruptly ended their relationship. Dr. Egan assessed Plaintiff as depressed and tearful, prescribed her an antidepressant, noted that she

denied memory loss, mental disturbance or suicidal ideation and appeared oriented, assessed her as stable. (R. 659-62). The ALJ reviewed and considered these records, as well as the testimony of Plaintiff, in evaluating Plaintiff's alleged mental functional limitations. Thus, the ALJ did not abuse his discretion by not ordering a consultative examination, but rather reasonably evaluated the mental functional limitation of Plaintiff.

2. *Whether the ALJ supported his Mental Residual Capacity Findings with Substantial Evidence.*

After careful consideration of the entire record, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform sedentary work with no balancing on heights and only simple, routine and repetitive tasks. Plaintiff argues that the ALJ's RFC findings are not supported by substantial evidence. Plaintiff also contends that the ALJ's mental RFC finding is actually contradicted by an assessment made earlier in his decision. The Court has not been persuaded.

Contrary to Plaintiff's suggestion, an RFC assessment is an administrative finding—not a medical assessment—which is exclusively reserved to the Commissioner. *See Arlow v. Colvin*, 2:13CV99, 2014 WL 1317606, at *5 (W.D. Pa. Mar. 28, 2014) (citing 20 C.F.R. §§ 404.1527(e), 416.927(e)). In this case, the ALJ carefully considered the entire record when he determined Plaintiff's RFC and what limitations must be imposed. The ALJ also reasonably accounted for Plaintiff's credibly established mental functional limitations by restricting her to simple, repetitive, routine work.

Further, the ALJ was not required to include in his RFC assessment his earlier finding that Plaintiff "has moderate difficulties with social functioning" when evaluating the paragraph B criteria. As the ALJ explained, "[t]he limitations identified in the 'paragraph B' criteria are not an [RFC] assessment but are used to rate the severity of mental impairments at steps two and

three of the evaluation process." (R.. 19). *See* 20 C.F.R. §§ 404.1520a; 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.02-12.08, 12.10; Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *4. Rather, "[t]he mental residual functional capacity assessment used at steps four and five of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8)." *Id. See also Beasley v. Colvin*, 520 F. App'x 748, 754 (10th Cir. 2013) ("But the ALJ's finding of 'moderate difficulties' in social functioning in the 'paragraph B' criteria does not necessarily translate to a work-related functional limitation for the purposes of the RFC assessment."). Thus, the ALJ properly did not include his moderate paragraph B findings in the RFC assessment or in the hypothetical at step five.

Additionally, the ALJ accounted for any limitation Plaintiff may have in social functioning in restricting Plaintiff to simple, routine, and repetitive tasks. (R. 21). *C.f. Menkes v. Astrue*, 262 F. App'x 410, 412 (3d Cir. 2008) ("Having previously acknowledged that Menkes suffered moderate limitation in concentration, persistence and pace, the ALJ also accounted for these mental limitations in the hypothetical question by restricting the type of work to 'simple routine tasks.'"). The occupations for these tasks include alarm monitor, credit checker, and hand packer. (R. 23). As the Commissioner highlights these jobs, by definition, ordinarily do not involve people, but more so objects. *See* SSR 85-15, 1985 WL 56857, at *4. Therefore, Plaintiff would not have much social interaction nor would she be required to make decisions.

3.    *Whether the ALJ Made Sufficient Credibility Findings.*

Plaintiff alleges that the ALJ did not make sufficient credibility findings as to her subjective complaints of pain. Although Plaintiff concedes that the record fails to demonstrate

18

that she has headaches at the frequency and severity that she alleged during the hearing, she claims that the ALJ discredited her other complaints such as numbness in her right hand, her inability to use her right arm except to help the left arm, (R. 38), her inability to sit for ten-fifteen minutes, (R.43), and her mental limitations (R. 45-50) without an explanation based on evidence from the record. The Court again does not agree.

Making credibility findings is within the purview of the ALJ. *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). An ALJ may reject the claimant's subjective testimony if he does not find it believable based on other evidence in the record, but he must explain his reasons for having done so. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 433 (3d Cir. 1999). The Court will defer to an ALJ's credibility findings, especially because the ALJ has observed the witness's demeanor. *Reefer*, 326 F.3d at 380. Additionally, the ALJ can determine credibility by having evaluated the inconsistencies between the Plaintiff's testimony and the medical evidence. 20 C.F.R. §§ 404.1529.(c)(2)-(3), 416.929(c)(2)-(3).

Here, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." (R. 20). In having reached this conclusion, the ALJ carefully considered the entire record, including Plaintiff's description of her symptoms in light of the objective medical record evidence which he discussed at length. (R. 19-22). Notably, the ALJ questioned Plaintiff and evaluated her credibility regarding her conservative mental health treatment, right arm numbness and the assistive use of her left hand (R. 38, 45) and her alleged inability to sit for more than ten-fifteen minutes despite having done so at the hearing, (R. 43-44).

The Plaintiff's testimony and medical evidence reflect substantial inconsistencies, but the ALJ nevertheless incorporated Plaintiff's complaints into her RFC. Based on the testimony and evidence, the ALJ limited Plaintiff to no more than occasional gripping, grasping and handling with her right hand, as well as limiting her to sedentary work with no crouching, crawling, or kneeling, after giving her the "benefit of the doubt." (R. 22). These limitations are consistent with the objective medical evidence in the record. Therefore, the Court finds that the ALJ's credibility assessment regarding Plaintiff's subjective complaints of pain has been supported by substantial evidence.

## IV. Conclusion

It is undeniable that Plaintiff has some impairments, and the Court is sympathetic and aware of the challenges that Plaintiff may face in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and his conclusion that Plaintiff is not disabled within the meaning of the Social Security Act, and that she is capable to perform sedentary work with certain limitations prohibiting climbing, crawling, kneeling, balancing on heights, no more than occasional gripping, grasping, and handling with her right, dominant hand; and that she is further limited to simple, routine, and repetitive tasks.

For these reasons, the Court will **GRANT** the Motion for Summary Judgment filed by the Commissioner and **DENY** the Motion for Summary Judgment filed by Plaintiff.

An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TERRI LYNN PRYBOROWSKI,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **2:13-cv-01038-TFM** |
| **v.** | ) |
| | ) |
| **CAROLYN W. COLVIN**, | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## ORDER OF COURT

**AND NOW**, this 14th day of July, 2014, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED,** and **DECREED** that the Motion for Summary Judgment filed by Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security (ECF No. 8) is GRANTED; and the Motion for Summary Judgment filed by Plaintiff Terri Lynn Pryborowski is DENIED.

BY THE COURT:

s/ Terrence F. McVerry
United States District Judge

cc:     Jaya A. Shurtliff
        Email: jshurtliff@kennethhiller.com
        Kenneth R. Hiller
        Email: khiller@kennethhiller.com

        Christy Criswell Wiegand
        Email: christy.wiegand@usdoj.gov

        (via CM/ECF)